# IN THE COURT OF COMMON PLEAS
# DARKE COUNTY, OHIO

| | | |
|---|---|---|
| WILLIAM FRANKE<br>337 S. High Street<br>Covington, OH 45318 | ) ) ) ) | CASE NO. 24CV00520<br><br>JUDGE: |
| Plaintiff, | ) ) | |
| v. | ) ) ) | **COMPLAINT FOR DAMAGES AND REINSTATEMENT** |
| MATHESON TRI-GAS INC.<br>198 Continental Ave.<br>Greenville, OH 45331 | ) ) ) ) ) | **JURY DEMAND ENDORSED HEREIN** |
| **Serve also:**<br>c/o CT CORPORATION SYSTEM<br>4400 Easton Commons Way,<br>Suite 125<br>Columbus, OH 43219 | ) ) ) ) ) ) | |
| Defendant. | ) | |

Plaintiff, William Franke, by and through undersigned counsel, as his Complaint against Defendant states and avers the following:

## PARTIES JURISDICTION & VENUE

1. Franke is a resident of the city of Covington, county of Miami, state of Ohio.

2. Matheson Tri-Gas is a domestic incorporated municipality within the State of Ohio that operates a place of business located at 198 Continental Ave., Greenville, OH 45331.

3. Matheson Tri-Gas Inc. was at all times hereinafter mentioned an employer within the meaning of Ohio R.C. § 4112.01 *et seq.*

4. Matheson Tri-Gas hires citizens of the state of Ohio, contracts with companies in Ohio, and owns or rents property in Ohio. As such, the exercise of personal jurisdiction over Matheson Tri-Gas comports with due process.

5. This cause of action arose from or relates to the contracts of Matheson Tri-Gas with Ohio residents, thereby conferring specific jurisdiction over Matheson Tri-Gas.

6. This Court is a court of general jurisdiction over the claims presented herein, including all subject matters of this Complaint.

7. Venue is proper in this District because the wrongs herein alleged occurred in this District.

## FACTS

8. Franke is a former employee of Matheson Tri-Gas.

9. Franke began working for Defendant in or around May 21, 2012.

10. Franke worked for Defendant as a Line Puller.

11. Franke worked on machines throughout his tenure with Defendant.

12. In or around May 2024, Franke started asking his supervisors about the safety of using product from machines that had different detectors and guarding than others, because he felt they were not safe for use ("First Safety Inquiry").

13. Franke was told by his supervisor, Vincent Stanley, that the machines were going to be serviced by maintenance and replaced with new proper machines.

14. Franke noticed that employees were continuing to work on the machines even after reporting their unsafe nature to management.

15. On or around May 16, 2024, Franke reported once again that the machines were continued to be used in a manner that was unsafe and the ice the machine produced was not being used for the proper purpose in accordance with policy ("First Safety Report").

16. On or around May 16, 2024, there was product that was sent out in the morning that had to be recalled because it was determined unsafe.

2

17. In meetings that were held with other employees, Franke raised these safety issues so they could be addressed properly.

18. Franke was told by Ben Graf in a meeting with other employees that product from the machines should be secluded after maintenance.

19. It is proper for a Line puller to work eighteen machines at a time.

20. On or around June 22, 2024, Franke was assigned to the production line by himself without any assistance ("First Unsafe Work Condition").

21. This was against safety protocol and created an unsafe work environment for Franke.

22. Due to the unsafe nature of this assignment, Franke did as he was instructed by his production manager, Ben Graf, if a situation like this were to occur and he fill out an Unsafe Work Report in the breakroom ("Second Safety Report").

23. As Frake went to the breakroom to fill out this report, he was met by Stanley.

24. As Franke requested the proper paperwork, he was told by Stanley that someone was being sent to assist him, and that Franke needed to return to the floor and fix his attitude.

25. Franke attempted to leave the breakroom and return to the floor, but Stanley began to yell at Franke and become more hostile.

26. Franke attempted to leave the break room as Stanley began to grow more hostile and proceeded to inch closer to Franke's face while yelling.

27. Stanley continued to yell at Franke in his face even after Franke repeatedly asked Stanley to stop.

28. Franke left the breakroom as Stanley continued to yell in a threatening manner, asking what was Franke going to do about Stanley being in his face.

29. Franke informed Stanley that he was going to notify management about Stanley's aggression towards him for simply following protocol.

30. After Franke reported this incident to another manager, Jon Mardin, Franke was told he needed to go home in spite of him not doing anything wrong.

31. Franke was told by Jon Mardin, that there would be an investigation concerning the incident between him and Stanley and he would be notified of the outcome by Ben Graf.

32. Franke was not notified by Ben Graf after the incident about what was going on concerning the investigation even though Mardin said he would be in contact with Franke.

33. On May 24, 2024, Defendant terminated Franke.

34. During the Termination Ryan Shaffer informed Franke of the termination.

35. As a direct and proximate result of Defendant's conduct, Franke suffered and will continue to suffer damages, including economic, emotional distress, and physical sickness damages.

### COUNT I: <u>WRONGFUL TERMINATION IN VIOLATION OF PUBLIC POLICY—WORKPLACE SAFETY</u>

36. Franke restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

37. A clear public policy exists and is manifested in <u>Ohio R.C. 4121.47</u>, stating that "[n]o employer shall violate a specific safety rule adopted by the administrator of workers' compensation pursuant to section 4121.13 of the Revised Code or an act of the general assembly to protect lives, health, and safety of employees pursuant to Section 35 Article II, Ohio Constitution…"

38. A clear public policy exists and is manifested in Ohio statutes and/or administrative regulations, or in the common law, against terminating and/or retaliating against an employee because he engages in protected activity under Ohio law.

39. A clear public policy exists and is manifested in Ohio R.C. § 4101.11, stating that "[e]very employer shall furnish employment which is safe for the employees engaged therein," and "[n]o employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe…"

40. Ohio R.C. § 4101.12 provides that "No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe."

41. Ohio R.C. § 4101.12 further provides that "No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters."

42. Ohio R.C. § 4101.12 further provides that "No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe."

43. The Ohio Supreme Court recognized that Ohio allows an individual to seek a public policy claim if she is terminated in retaliation for reporting to her employer that she is forced to work in an unsafe work environment. *Greeley v. Miami Valley Maintenance Contrs., Inc.*, (1990), 49 Ohio St.3d 228. See also *Pytlinski v. Brocar Products, Inc.*, 94 Ohio St.3d 77 (Ohio 2011); *Jenkins v. Cent. Transp., Inc.*, No. 09CV525, 2010 WL 420027 (N.D. Ohio Jan. 29, 2010).

44. The United States District Court for the Southern District of Ohio held "*Pytlinski* is still controlling, it is still good law, and it could not be clearer: 'Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful

5

discharge in violation of public policy may be prosecuted.'" *Lightner v. CB&I Constructors, Inc.*, No. 14-CV-2087, 2016 WL 6693548, at *10 (S.D. Ohio Nov. 14, 2016) (quoting *Pytlinski*).

45. The United States District Court for the Southern District of Ohio held: "Retaliation against employees who file complaints regarding workplace safety, there, clearly contravenes the public policy of Ohio." *Hucke v. Marriott Hotel Services, Inc.*, 2008 WL 11352589, *4 (S.D. Ohio), report and recommendation rejected on unrelated grounds in *Hucke v. Marriott Hotel Services, Inc.*, 2008 WL 11352630 (S.D. Ohio).

46. The Tenth District Court of Appeals in *Blackburn v. Am. Dental Ctrs.*, 22 N.E.3d 1149, 1158 (10th Dist. 2014) held that Ohio R.C. §§ 4101.11 4101.12 "establish that there exists a clear public policy that is manifested in a state or federal constitution, statute, or administrative regulation in Ohio favoring workplace safety for employees and frequenters."

47. The Tenth District Court of Appeals in *Blackburn*, further held that Ohio has a public policy prohibiting terminating the employment of individuals who make complaints regarding an unsafe work environment.

48. The Ninth District Court of Appeals has held that "[w]orkplace safety is a well defined and dominant public policy based on federal, state, and common law." *Akron Metro. Hous. Auth. v. Local 2517, Am. Fedn. of State, Cty., & Mun. Emp., AFL-CIO*, 161 Ohio App.3d 594, 597 (9th Dist. 2005)

49. A clear public policy exists and is manifested in Ohio statutes, and/or administrative regulations, or in the common law, against terminating an employee based on their complaints of dangerous, unsafe, or illegal activity.

50. Defendant's employees became aware that Plaintiff made complaints regarding workplace safety.

51. In terminating Plaintiff's employment, Defendant dissuaded its employees from making complaints regarding workplace safety.

52. Defendant's termination of Franke jeopardizes these public policies.

53. Defendant's termination of Franke was motivated by conduct related to these public policies.

54. Defendant had no overriding business justification for terminating Franke.

55. As a direct and proximate result of Defendant's conduct, Franke has suffered and will continue to suffer damages, including economic and emotional distress damages.

## DEMAND FOR RELIEF

WHEREFORE, William Franke demands from Defendants the following:

(a) Issue an order requiring to restore Franke to one of the positions to which he was entitled by virtue of his application and qualifications, and expunge his personnel file of all negative documentation;

(b) An award against each Defendant of compensatory and monetary damages to compensate Franke for physical injury, physical sickness, lost wages, emotional distress, and other consequential damages, in an amount in excess of $ 25,000 per claim to be proven at trial;

(c) An award of punitive damages against each Defendant in an amount in excess of $ 25,000;

(d) An award of reasonable attorneys' fees and non-taxable costs for Franke's claims as allowable under law;

(e) An award of the taxable costs of this action; and

(f) An award of such other relief as this Court may deem necessary and proper.

Respectfully submitted,

/s/ *Trisha Breedlove*
Trisha Breedlove (0095852)
William LaGrone (0104119)
**SPITZ, THE EMPLOYEE'S LAW FIRM**
1103 Schrock Road
Busch Corporate Center - Suite 307
Columbus, OH 43229
Phone: (614) 683-7331
Fax: (216) 291-5744
Email: trisha.breedlove@spitzlawfirm.com

*Attorneys For Plaintiff*
*William Franke*

## JURY DEMAND

Plaintiff William Franke demands a trial by jury by the maximum number of jurors permitted.

/s/ Trisha Breedlove
Trisha Breedlove (0095852)
William LaGrone (0104119)